# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MICHAEL R.[1],                          Case No. 1:20-cv-990
      Plaintiff,                      Litkovitz, M.J.

    vs.

COMMISSIONER OF                         **ORDER**
SOCIAL SECURITY,
      Defendant.

Plaintiff Michael R. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for

judicial review of the final decision of the Commissioner of Social Security (Commissioner)

denying his application for disability insurance benefits (DIB).  This matter is before the Court

on plaintiff's Statement of Errors (Doc. 13), the Commissioner's response (Doc. 18), and

plaintiff's reply (Doc. 19).

## I.  Procedural Background

Plaintiff filed his application for DIB in April 2017, alleging disability since September

23, 2016, due to superior semi-circular canal dehiscence (SSCD); severe vertigo; hearing

loss/autophony; binocular vision dysfunction; depression; and anxiety.  (Tr. 457).  The

application was denied initially and upon reconsideration.  Plaintiff, through counsel, requested

and was granted two *de novo* hearings before administrative law judge (ALJ) Renita Bivins on

September 5, 2019, and March 12, 2020.  (Tr. 44-110).   Plaintiff appeared and testified at both

ALJ hearings.  A vocational expert (VE) also appeared and testified at the March 12, 2020 ALJ

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

hearing.  On April 15, 2020, the ALJ issued a decision finding plaintiff was not disabled.  (Tr. 15-34).  The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

> 5) If the claimant can make an adjustment to other work, the claimant is not
> disabled.  If the claimant cannot make an adjustment to other work, the claimant
> is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four

steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. [Plaintiff] meets the insured status requirements of the Social Security Act
> through September 30, 2023.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since September 23,
> 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. [Plaintiff] has the following severe impairments: vertiginous syndrome,
> semicircular canal dehiscence, major depressive disorder, anxiety without
> agoraphobia, headaches/migraines (20 CFR 404.1520(c)).
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments in 20
> CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and
> 404.1526).
>
> 5. After careful consideration of the entire record, [the ALJ] finds that

[plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently; able to stand and/or walk 30 minutes at a time for 6 hours per 8-hour day and sit 30 minutes at a time for 6 hours per 8-hour day with normal breaks.  He can never climb ladders, ropes or scaffolds. He is limited to work in an environment with moderate noise levels but no loud noise.  He must avoid all exposure to hazards, such as unprotected heights of ladders, ropes or scaffolds.  He can maintain concentration, attention and sustain persistence and pace[,] complete detailed tasks but no complex task and no fast-pace requirements.  He can interact with coworkers without distracting them or exhibiting behavioral extreme[sic].  He can interact with supervisors occasionally or no more than one third of the workday.  He can adapt adequately to usual changes in a work setting with adequate awareness of normal hazards and capacity to respond with appropriate precautions.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]

7. [Plaintiff] . . . was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569 and 404.1569a).[3]

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from September 23, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-34).

---

[2] Plaintiff's past relevant work was as a fire protection engineer, a skilled, light (but performed as sedentary) exertion position; and a sprinkler system installer servicer, a skilled, heavy exertion position.  (Tr. 32, 63-65).
[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as routing clerk (70,000 jobs nationally with an alternating sit/stand limitation), parking lot cashier (200,000 jobs nationally), and ticket seller (140,000 jobs nationally).  (Tr. 33, 68).

C.      **Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a [plaintiff] on the merits or deprives the [plaintiff] of a substantial right."  *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

5

D.     **Medical Evidence**

1. Physical impairments

Plaintiff was first diagnosed with SSCD[4] in September 2014 by otolaryngologist Myles

Pensak, M.D., on referral by his primary care provider Paula Lafranconi, M.D.  (Tr. 699).

Plaintiff presented with a chief complaint of dizziness, explaining that he first began

experiencing vertigo/imbalance two to three years prior.  (*Id.*).  Plaintiff reported occasional

extreme episodes and persistent milder symptoms.  (*Id.*).  In March 2016, plaintiff underwent a

left transmastoid subtemporal resurfacing of the left superior canal dehiscence with cartilage

graft with Dr. Pensak.  (Tr. 667).  In May 2016, plaintiff reported that the surgery resulted in no

improvement in symptoms or hearing changes.  (Tr. 673).

In July 2016, plaintiff saw Ravi Samy, M.D., and Adele Rauen, P.A., for a second

opinion regarding the surgery.  (Tr. 601).  Plaintiff reported that Tullio's and pressure-induced

dizziness had improved by 90% but that imbalance and spontaneous dizziness remained,

including while driving.  (*Id.*).  Plaintiff reported average dizziness at a level of 7/10 which could

spike to 10/10 without an appreciable trigger.  (*Id.*).  Dr. Samy also summarized plaintiff's prior

treatment for headaches, Topamax and Pamelor, which either did not help or worsened them.

(*Id.*).  Dr. Samy referred plaintiff to Vince Martin, M.D., for his headaches and to David Blair,

O.D., for a vision dysfunction evaluation.  (Tr. 603).

---

[4] According to Johns Hopkins Medicine, SSCD is a "rare condition" that is "caused by an abnormal opening
between the uppermost semicircular canal in the upper part of the inner ear and the brain.  The condition causes
problems with hearing and balance."  *See* https://www.hopkinsmedicine.org/health/conditions-and-
diseases/superior-canal-dehiscence-syndrome-scds (last visited February 9, 2022).

In October 2016, plaintiff saw Dr. Samy and reported worsening autophony and hearing loss and a new left aural fullness, which was his primary complaint. (Tr. 609). Dr. Samy was concerned that plaintiff's cartilage graft may have resorbed with renewed dehiscence. (*Id.*). A November 2016 CT scan showed thinning of the roof of the superior semicircular canal on the right and severe opacification of residual air cells and dehiscence of the superior semicircular canal on the left. (Tr. 617).

Later in November 2016, plaintiff saw neurologist Brinder Vij, M.D., seeking help to "manage headaches and improve quality of life." (Tr. 625). Plaintiff reported suffering 8-10 headaches per month. (Tr. 624). Plaintiff reported that the headaches were associated with nausea and photo/phonophobia and worsened with bright light, loud noise, stress, and weather changes. (*Id.*). His physical and neurological examinations that day were normal. (Tr. 626-27). Plaintiff also underwent an audiologic evaluation later in November 2016 that showed excellent word recognition in both ears and normal right-eared hearing. (Tr. 702).

In February 2017, plaintiff was fitted for prismatic lenses to improve symptoms of visual misalignment. (Tr. 586). At a follow-up appointment the next month, plaintiff reported improvements in anxiety attacks and migraines and associated improvement in driving ability; but he also noted that his dizziness had already begun to return. (*Id.*). Also in March 2017, at a follow-up with Ms. Rauen (otolaryngology P.A.), plaintiff reported worsening left-sided tinnitus, constant deep-set sharp pain, and retro orbital pain. (Tr. 639). Plaintiff noted that Excedrin helped, but he could not tolerate Metoprolol and the supplements recommended by a neurologist

had not helped.  (*Id.*).  Ms. Rauen noted "Weber to the left."[5]  (Tr. 640).  Plaintiff also reported

persisting balance issues and noted a recent fall that resulted in a hip injury.  (Tr. 639).  At a visit

with primary care provider Dr. Lafranconi regarding that fall, plaintiff reported vertigo that

improved with prisms.  (Tr. 865-66).

      In April 2017, plaintiff underwent a head MRI, which resulted in a differential diagnosis

of ischemic disease and sequelae of migraine headaches.  (Tr. 643).  At a visit with Dr. Samy the

same day, plaintiff reported headaches, dizziness with driving, and aural fullness, though he

reported being "much more active."  (Tr. 645).  Dr. Samy noted: "Weber midline.  Rinne was

positive bilaterally."  (Tr. 646).

      In May 2017, plaintiff saw Dr. Pensak, and Weber and Rinne test results were the same

as they were in April.  (Tr. 697).  Plaintiff reported persistent aural fullness, greater in the left ear

than the right, and continuing dizziness and imbalance.  (Tr. 696-97).  On physical examination,

Dr. Pensak noted that plaintiff was "anxious and [u]nsteady."  (Tr. 698).  In September 2017,

plaintiff saw Ms. Rauen for ear cleaning and reported ear pressure, fullness, and tinnitus (all

greater in his left ear than right)—with the tinnitus being "much worse."  (Tr. 853).  Plaintiff also

reported worsening hearing loss (greater in his left ear than his right),dizziness, and memory

changes.  (*Id.*).

      Also in September 2017, plaintiff underwent a neuropsychological examination with

George Jewell, Ph.D., and reported tinnitus, balance issues, dizziness, hearing loss worse than

reflected by testing, memory issues, anxiety, depression, and insomnia.  (Tr. 846-47).  Plaintiff

---

[5] Characterizing this record, the ALJ stated that "[plaintiff] heard the Weber test on the left."  (Tr. 23).  A Weber test is a screening test for evaluating hearing loss.  *See* http://www.ncbi.nlm.nih.gov/books/NBK526135/ (last visited Feb. 19, 2022).

8

reported driving very little and the inability to maintain employment due to his dizziness and related symptoms.  (*Id.*).  Plaintiff also reported that his prismatic lenses "only help[ed] a little." (Tr. 847).

In February 2018, plaintiff reported to Dr. Lafranconi that his vertigo was worsening and caused him to vomit while driving and drive off the road, but he did not want to stop working. (Tr. 864).  In March 2018, he followed up with Dr. Samy and his Weber and Rinne test results were unchanged from the preceding April and May.  (Tr. 898).  A pneumatic otoscopy invoked dizziness that was greater on the left than on the right.  (*Id.*).

In April 2018, on Dr. Samy's referral, plaintiff saw Dr. Martin for his headaches.  (Tr. 935).  Plaintiff estimated having one headache per week with 8/10 severity accompanied by nausea, throbbing and stabbing pain, photo/phonophobia, with Excedrin reducing the length of headaches.  (Tr. 936).  Plaintiff also reported less severe left ear and left retro-orbital pain three days per week.  (*Id.*).  On physical examination, he displayed an ataxic gait and "positive Rhomberg[.]"  (Tr. 940).  At a follow-up with Dr. Martin in June 2018, plaintiff continued to report weekly headaches with nausea or photo/phonophobia.  (Tr. 926).  Plaintiff reported that Excedrin helped within 30 minutes.  (*Id.*).  Plaintiff also reported muffling of the ear, constant dizziness/imbalance, and headache exacerbated by exertion and car travel.  (*Id.*).  At a follow-up in November 2018, plaintiff reported that his migraine headaches were now occurring two days per week.  (Tr. 915).  Plaintiff did not want to try CGRP monoclonal antibodies, a relatively new treatment, or other preventatives.  (Tr. 916).

At visits between 2017 and 2019 with psychologist Sarah Belew Cox, Psy.D., and psychiatrist Charla Jones, M.D., plaintiff generally exhibited unsteady gate, imbalance, or used an assistive device (Tr. 954, 958, 962, 966, 974, 982, 986, 990, 994, 998, 1008, 1011, 1015, 1019, 1054, 1058, 1062) but occasionally did not (Tr. 970, 978, 1002).  At a January 2020 visit with Dr. Jones, he nearly fell getting out of his seat.  (Tr. 1054).  When establishing care with a new primary care doctor in September 2018 after Dr. Lafranconi retired (*see* Tr. 90), plaintiff reported migraines, gait problems, dizziness, weakness, and headaches.  (Tr. 1039, 1041).  At cholesterol-related visits to Tri-Health in 2018 and 2019, however, plaintiff did not report dizziness, weakness, or headaches.  (Tr. 1026, 1028, 1031, 1033).

2. <u>Mental impairments</u>

In September 2016, plaintiff reported increased panic and anxiety attacks to Dr. Lafranconi, though he was "alert" and "oriented" during the visit.  (Tr. 866).  Ms. Rauen and Dr. Vij recorded plaintiff's mood and effect as normal during July and November 2016 visits concerning his physical impairments.  (Tr. 627, 676).  The same was true at a January 2017 visit with Dr. Samy.  (Tr. 690).  At a January 2017 therapy session with Dr. Cox, plaintiff reported three high anxiety incidents and possible depression but also decreased anxiety and panic attacks. (Tr. 1001-02).  Later that month, plaintiff reported no panic attacks for several months and improvement in depression, concluding that he did not need further sessions at that time.  (Tr. 997).  In March 2017, in connection with his prismatic lenses, plaintiff reported that he was not experiencing anxiety attacks and reflected normal mood and orientation.  (Tr. 586, 588).

10

During his September 2017 neuropsychological examination with Dr. Jewell (Tr. 846-50), plaintiff reported difficulties with concentration, short term memory, starting tasks, task follow through, and remembering conversations, and that these symptoms had worsened after his March 2016 surgery. (Tr. 846). Plaintiff reported a history of anxiety and episodes of severe anxiety attacks that worsened when he experienced dizziness or imbalance. (Tr. 847). Plaintiff reported that his anxiety attacks had been as frequent as 3-4 times per day, which had improved, but which also seemed to be worsening since he stopped seeing Dr. Cox. (*Id.*). Plaintiff also reported depression and related medication, which was not effective, and long term insomnia; but he had not required inpatient treatment or received a bipolar disorder diagnosis. (*Id.*). After administering a battery of related tests, Dr. Jewell diagnosed major depressive disorder, recurrent, moderate, and anxiety disorder NOS (mixed generalized and panic disorder features), stating:

> [Plaintiff's] premorbid level of overall intellectual functioning is estimated to be high average. Compared to others of the same age and educational level he performed within expected limits in all major areas of cognitive functioning including complex attention, executive functioning, language, visual perception/construction, and auditory and visual memory.
>
> [Plaintiff's] neuropsychology test profile was within normal limits. . . . His evaluation provides no objective evidence of neurologically based cognitive dysfunction. . . . I suspect that his complaint of worsening cognitive functioning is attributable to increased mood and anxiety symptoms.

(Tr. 849).

Plaintiff also underwent a consultative psychological evaluation in September 2017 with Jena Wierwille, Psy.D. (Tr. 784-89). Plaintiff reported that auditory changes, balances issues, pain, headaches, vision dysfunction, and falling all contributed to his anxiety attacks. (Tr. 784).

11

Plaintiff reported that treatment with Dr. Cox was initially helpful, but he was having issues again and could not afford restarting treatment. (Tr. 786). Plaintiff reported incidents of spontaneous crying, thoughts of self-harm while on medication, depressed mood, low energy/motivation, and constant anxiety. (Tr. 786). At the evaluation, Dr. Wierwille noted plaintiff's depressed and irritable mood. (*Id.*). Dr. Wierwille recorded largely normal mental status findings, aside from plaintiff describing his mood as "agitated," endorsing suicidal thoughts, and becoming tangential and requiring redirection at times. (Tr. 787).

At a September 2017 ear cleaning with Ms. Rauen, plaintiff exhibited normal mood and affect. (Tr. 854). At a February 2018 primary care visit with Dr. Lafranconi, he was "alert" and "oriented." (864). At an April 2018 visit with headache specialist Dr. Martin, plaintiff exhibited normal affect. (Tr. 940).

Plaintiff returned to therapy with Dr. Cox in March 2018 for anxiety and panic attacks. Dr. Cox noted "apparent" and "significant" depression. (Tr. 993). Plaintiff reported high anxiety, frequent panic attacks, being very depressed, the inability to drive and work safely, hopelessness, lack of purpose, dizziness, headaches, and thoughts of self-harm. (Tr. 995). Later in March, his mood was "depressed" and his affect "restricted." (Tr. 986, 990).

In April 2018, plaintiff reported that Pristiq improved his mood but had urination and sex drive side effects. (Tr. 981). Dr. Cox reported improvement in mood and affect. (*Id.*). In May 2018, plaintiff reported slight improvement in mood and reduced anxiety attacks. (Tr. 979). Later that month, plaintiff reported somewhat reduced depression and anxiety and no panic attacks since his last visit, which he believed was attributable to medication. (Tr. 975). In July

12

2018, plaintiff reported good days and bad days (tied to his SSCD symptoms) but also that he was experiencing some relief from symptoms, doing more purposeful activities, and was not having suicidal thoughts. (Tr. 971). In August 2018, plaintiff's depression worsened with a reemergence of suicidal thoughts. (Tr. 967). Following a September 2018 report of reduced panic and anxiety with only fleeting suicidal thoughts (Tr. 963), plaintiff requested an "urgent" appointment in October 2018. (Tr. 959). Plaintiff experienced an increase in suicidal thoughts possibly related to his physical impairment symptoms and increased household stress. (*Id.*). In general, after reestablishing mental health care in March 2018, plaintiff's mental status examinations consistently reflected depressed mood and varied affect. (Tr. 954 (dysthymic mood, full affect); 958 (anxious, depressed, frustrated mood; full affect); 962 (depressed mood, full affect); 966, 970, 978, 982 ("ok" mood, fair/full affect); 974 (anxious and dysthymic mood, full affect); 986, 990, 994 (anxious, depressed, and/or agitated mood; restricted affect)).

Plaintiff began treating with psychiatrist Dr. Jones in February 2019. (Tr. 1014). Plaintiff reported that Pristiq helped overall and that his suicidal thoughts had ceased. (*Id.*). On mental status examination, plaintiff displayed a dysthymic mood and mood-congruent affect. (Tr. 1015). In April 2019, plaintiff reported that medication helped to stabilize his mood and that he had not had a panic attack since his last appointment. (Tr. 1010). On mental status examination, plaintiff exhibited a dysthymic mood and mood-congruent affect. (Tr. 1011). In July 2019, plaintiff presented to Dr. Cox in a state of high distress, a depressed and irritable mood, and with mood-congruent affect. (Tr. 1008). On mental status examination that same day, Dr. Jones reported depressed mood and mood-congruent affect. (Tr. 1018-19). Dr. Jones

reported that plaintiff's anxiety was well controlled but he continued to have significant

symptoms of depression.  Dr. Jones added Abilify to plaintiff's Pristiq regimen.  (Tr. 1020).  In

August 2019, plaintiff reported insomnia and irritability since taking Abilify and exhibited an

anxious and depressed mood.  (Tr. 1057-58).  Dr. Jones discontinued Abilify and prescribed

Seroquel.  (Tr. 1062).  In January 2020, plaintiff reported increased anxiety (15-20 panic attacks

since his last visit), difficulty sleeping even with Trazodone, increased irritability, difficulty

concentrating, passive suicidal thoughts, and problems with motivation and concentration.  (Tr.

1053).  On mental status examination, plaintiff's mood was depressed and anxious and his affect

was mood-congruent.  (Tr. 1054).  Dr. Jones made the following assessment:

> [Major Depressive Disorder] recurrent severe without psychotic sym[toms]
> Panic Disorder without agoraphobia
>
> [Plaintiff's] symptoms have increased since his last appointment.  Seroquel was
> attempted at 50 mg in August, he reported excessive sedation.  Given his current
> complaint[s] of irritability, restlessness and insomnia will re-initiate[] treatment
> with [S]eroquel but at the lower dose of 25 mg daily.

(Tr. 1055).

### 3. Medical source opinions

The record contains opinions from seven treating medical providers, two "one-time"

consultative examiners, and four state agency reviewers regarding plaintiff's medical conditions.

#### a.  Dr. Samy (chief of otology/neurotology department)

In a November 2017 narrative opinion, Dr. Samy referenced a detailed summary of

plaintiff's treatment and symptoms related to his inner ear conditions prepared by Ms. Rauen, a

P.A. in his office.  (Tr. 859-63).  He stated: "We have done numerous things to try to help

14

[plaintiff], but he continues to have significant problems. . . . [P]laintiff has been very compliant and has done whatever has been needed. . . . However, he is still beset by significant dizziness." (Tr. 858).

### b. Dr. Pensak (otolaryngologist)

In a February 2018 narrative opinion, Dr. Pensak began by describing the CT scan leading to plaintiff's SSCD diagnosis. (Tr. 878). He also incorporated Ms. Rauen's summary of plaintiff's condition referred to by Dr. Samy. (*Id.*). He then stated as follows:

> In response to the significant impairment related to focus, attention, and concentration [plaintiff] would in my opinion likely be 'off task' a good part of the day depending on the exacerbation of symptoms and episodes related to vertigo. It would be necessary for [plaintiff] to take frequent unscheduled breaks when he is experiencing symptoms. These breaks would prove helpful in allowing the patient time to get relief of his symptoms. His absence from work[] would be determined by the severity of symptoms [which had escalated as of a recent office visit].

(*Id.*)

### c. Ms. Rauen (P.A.[6] to Drs. Samy and Pensak)

In a December 2018 narrative opinion, Ms. Rauen began by describing the CT scan leading to plaintiff's SSCD diagnosis. She then stated:

> It is my medical opinion that [plaintiff's] symptoms are consistent with [SSCD]. . . . [Plaintiff] complied diligently to recommended treatments and second opinions, however, he has been unable to overcome the effects of his disorder and impairment of his activities of daily living remain.
>
> In response to the significant impairment related to focus, attention, and concentration: In my opinion, [plaintiff] would likely be "off task" a good part of the day depending on exacerbation of symptoms related to vertigo and disequilibrium, approximately 10-15 minutes of every hour (or 20-25% of the

---

[6] "*Acceptable medical source[s]*" include "Licensed Physician Assistant[s] for impairments within his or her licensed scope of practice (only with respect to claims filed (see § 404.614) on or after March 27, 2017)." 20 C.F.R. § 404.1502(a)(8).

day). It would be necessary for [plaintiff] to take frequent unscheduled breaks when he is experiencing symptoms. These breaks would prove helpful in allowing the patient time to get relief of his symptoms. His absence from work[] would . . . be approximately/probably 1-2 days a week. . . . [Plaintiff] remains unable to drive long distances. . . . [H]ighway speed and distance will trigger symptoms.

(Tr. 950).

### d.  Dr. Martin (headache specialist)

In a November 2018 attending physician statement, Dr. Martin first stated that plaintiff's 2016 ear surgery did not cause but likely exacerbated plaintiff's migraine headaches. (Tr. 881). He further opined that plaintiff would miss work due to his headache condition 7-10 days per month. (Tr. 882). Dr. Martin's statement incorporates a recitation of plaintiff's SSCD diagnosis and reported symptoms. (Tr. 881).

### e.  Dr. Lafranconi (primary care)

In her May 2018 narrative opinion, Dr. Lafranconi noted that plaintiff has been her patient since 2004. (Tr. 880). She stated that plaintiff's vertigo symptoms began in 2012 and have become "debilitating." (*Id.*). Dr. Lafranconi emphasized that plaintiff has continually tried to work despite the onset of symptoms. (*Id.*).

### f.  Dr. Cox (psychologist)

Dr. Cox completed two mental health assessment forms, one in November 2018 and another in August 2019. (Tr. 951-52, 1022-23). In 2018, she opined that plaintiff would fail to maintain appropriate attention, focus, and concentration 25% of an 8-hour workday and would fail to persist at work-like tasks and effectively deal with and handle normal work stress 50% of an 8-hour workday. (Tr. 951). Dr. Cox further opined that plaintiff would suffer extreme loss

16

(defined as "very significant loss of ability; patient would struggle in this area of function throughout the course of a normal day") in the ability to demonstrate normal punctuality and reliability day in and day out. (Tr. 951-92). Dr. Cox listed plaintiff's diagnoses of "major depressive disorder, recurrent moderate to severe range (currently severe without psychotic features) and generalized anxiety disorder" and elaborated:

> [T]he patient's medical problems are exacerbated by anxiety and panic attacks and severe depression. The inverse is especially true, as panic attacks occur more frequently when SSCD is present, particularly when patient is driving or walking. When his physical symptoms are present and severe rendering him unable to function, depression worsens to the degree of suicidal ideation.

(Tr. 951-52). Dr. Cox concluded that the above would result in plaintiff's total inability to function outside the home five or more days per month. (*Id.*).

Dr. Cox's opinion was largely the same in August 2019, except that she increased her estimate of plaintiff's inability to maintain appropriate attention, focus, and concentration throughout an 8-hour workday to 50% of the time and characterized plaintiff's loss in the ability to persist at work-like tasks and effectively deal with and handle normal work stress as "extreme." (Tr. 1022-23). She elaborated:

> When vestibular dysfunction impairs balance, concentration and gait he cannot perform . . . work or be social. This leads to severe depression with contemplation of suicide. When mood is poor, he lacks physical energy or motivation to manage physical problems.

(Tr. 1023).

### g. *Dr. Jones (psychiatrist)*

Dr. Jones provided a narrative opinion in August 2019. (Tr. 1024). She stated that plaintiff's "[vestibular dysfunction] is so severe he has been unable to work in any capacity.

This has greatly impacted his mental health." (*Id.*). Dr. Jones lists several of plaintiff's reported symptoms—anhedonia, issues with activities of daily living, low motivation, concentration issues, sleep disturbance, irritability, and suicidal ideation—concluding that he "continues to struggle with significant depression as a result of his inability to work due to his chronic medical condition." (*Id.*).

### h. Dr. Jewell (neuropsychological examiner)

In September 2017, Dr. Jewell examined plaintiff at the request of Dr. Pensak. (Tr. 846). He did not find evidence of neurologically-based cognitive dysfunction but stated: "I do not think it is likely that [plaintiff] would be successful in a work situation unless he improves in terms of his mood and anxiety symptoms." (Tr. 850).

### i. Dr. Wierwille (consultative examiner)

Dr. Wierwille conducted a psychological evaluation of plaintiff in September 2017 and stated:

> [Plaintiff] reported difficulties with concentration and focus as well as psychomotor agitation and these symptoms were consistent with his presentation during the interview. [Plaintiff] tracked the flow of conversation adequately throughout the interview and responded appropriately when asked to perform cognitive tests, but became tangential at times, forgetting instructions provided by the examiner and requiring redirection. These signs and symptoms suggest that [plaintiff] may demonstrate objective limitations in [maintaining attention and concentration and in maintaining persistence and pace] at a level prompting performance concerns by others.

(Tr. 789).

> j. *Courtney Zeune, Psy.D., and Robyn Murry-Hoffman, Ph.D., (state agency reviewers on mental impairments)*

In September 2017, Dr. Zeune found that plaintiff had no significant limitations in any abilities related to concentration or persistence. (Tr. 123). Dr. Zeune reviewed Dr. Wierwille's opinion and determined that it overstated plaintiff's restrictions/limitations; she did not otherwise elaborate. (Tr. 125). In December 2017, Dr. Murry-Hoffman concurred with Dr. Zeune's assessment on reconsideration, having also considered Dr. Jewell's neuropsychological examination. (Tr. 140-41). Like Dr. Zeune, Dr. Murry-Hoffman did not elaborate on why she thought that Dr. Wierwille's opinion overstated plaintiff's restrictions/limitations. (Tr. 142).

> k. *Elizabeth Das, M.D., and Gerald Klyop, M.D., (state agency reviewers on mental impairments)*

In August 2017, Dr. Das assessed no exertional limitations; assessed postural limitations including that plaintiff could occasionally climb ramps/stairs and never climb ladders/ropes/scaffolds; and assessed environmental limitations that plaintiff must avoid even moderate exposure to hazards. (Tr. 121-22). Dr. Das cited plaintiff's "vertiginous disorder" as the basis for these restrictions but added, "audiogram shows hearing [within normal limits] excellent word reception [and] no [medical evidence of record] on vision impairment[.]" (Tr. 122). On reconsideration in December 2017, Dr. Klyop concurred, specifically noting Dr. Jewell's neuropsychological examination and a new record from Ms. Rauen showing adequate hearing, vision, and motor functioning and normal mood, ocular motility, skin, breathing, and nerve functioning. (Tr. 139). Dr. Klyop did not review several treating source medical opinions

submitted by plaintiff's counsel the day before rendering his opinion.  (Doc. 19 at PAGEID 1210 n.1).

**E.**      **Specific Errors**[7]

On appeal, plaintiff raises three primary arguments: (1) the ALJ erred at Step Three of the sequential evaluation by determining that plaintiff met none of the potentially applicable Listings (2.07, 12.04, or 12.06), (2) the ALJ's residual functional capacity (RFC) determination was not supported by substantial evidence and was instead based on a mischaracterization and unreasonable recitation of the record evidence, and (3) the ALJ erred in her consideration of the medical opinion evidence by failing to apply 20 C.F.R. § 404.1520c.

1.  <u>Medical opinion evidence</u>

How the ALJ evaluated the medical opinions of record is relevant to her consideration of the Listings.  As such, the Court begins with plaintiff's last assignment of error.  Plaintiff argues that the ALJ's decision to assign greater weight to the state agency reviewers (Drs. Das, Klyop, Zeune, and Murry-Hoffman) than to his treating and examining physicians is not supported by substantial evidence.  Plaintiff relatedly argues that the ALJ failed to discuss the supportability of the state agency reviewers' opinions.  Plaintiff also argues that the agreement among the opinions of plaintiff's treating physicians, the opinions of the "one-time" examining physicians, and third-party statements demonstrate that their opinions are more consistent with the record as a whole.

_____

[7] Plaintiff filed memoranda in this case exceeding twenty pages without first obtaining leave of the Court.  This violates the undersigned's Standing Order.  (*See* Standing Order on Civil Procedures, I.G).  In the interest of expediency, the Court will proceed with the memoranda as filed.  Counsel is advised, however, that compliance will be enforced in future cases.

For claims filed on or after March 27, 2017, new regulations apply for evaluating medical opinions. *See* 20 C.F.R. § 1520c (2017); *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). These new regulations eliminate the "treating physician rule" and deference to treating source opinions, including the "good reasons" requirement for the weight afforded to such opinions.[8] *Id.* The Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[9], including those from your medical sources." 20 C.F.R. § 41520c(a). Rather, the Commissioner will consider "how persuasive" the medical opinion is. 20 C.F.R. § 1520c(b).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 1520c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 1520c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[10] and supporting

---

[8] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[9] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850. For clarity, the Court will refer to the limitations opined by the state agency reviewers as "assessments" or "opinions."

[10] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL

explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 1520c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 1520c(c)(2). The ALJ is required to "*explain* how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 1520c(b)(2) (emphasis added). Conversely, the ALJ "may, but [is] not required to, explain" how he/she considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 404.1520c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 404.1520c(d).

The ALJ found the opinions of Drs. Das and Klyop, that plaintiff suffered no exertional limitations and only minor postural/environmental limitations, persuasive because they were "well-supported and consistent with other evidence." (Tr. 28). The ALJ cites "varying exam findings and reports[,]" referring specifically to normal neurological and physical examinations by Dr. Vij on November 17, 2016 that conflicted with plaintiff's reports of 8-10 headaches a month (*id.*, referring to Tr. 624, 627); an audiology examination in 2016 reflecting hearing within normal limits and excellent word recognition (*id.*, referring to Tr. 702); the fact that

_____

168819, at *5850.

"[v]estibular evoked myogenic potentials ("VEMP") . . . [were] present during testing in November and December [2016]" (*id.*, referring to Tr. 707-14); reports of some improvement with prismatic lenses and Excedrin (*id.*, referring to Tr. 586, 936); the fact that plaintiff did not report or demonstrate symptoms related to his physical impairments at a July 2019 cholesterol check (*id.*, referring to Tr. 1028-29); and plaintiff's sometimes normal gait at counseling sessions (*id.* at Tr. 29, referring to Tr. 953-1004, 1006-17, 1054).

The Court has reviewed this evidence and finds that the ALJ failed to "*explain* how [she] considered the . . . consistency factor[] for a medical source's medical opinions" in the written decision as required by the regulations. 20 C.F.R. § 404.1520c(b)(2) (emphasis added). The fact that plaintiff had normal neurological and physical examinations on a particular day is not inconsistent with generally suffering 8-10 headaches per month. *See Spencer v. Astrue*, No. 3:10-cv-365, 2012 WL 404896 (S.D. Ohio Feb. 8, 2012), *report and recommendation adopted*, 2012 WL 966053 (S.D. Ohio Mar. 21, 2012) (ALJ incorrectly failed to recognize the "sudden, temporary, or fluctuating symptoms of Meniere's disease" and instead relied only on evidence that supported his position). The ALJ's reference to the 2016 audiology examination glosses over the fact that plaintiff's hearing was normal in *only one* ear. (*See* Tr. 702 (noting that hearing was within normal limits as to "AD" but not as to "AS")). The ALJ does not attempt to explain the VEMP testing results or what they mean in the context of SSCD. As for the reference to some reported improvement with prismatic lenses and Excedrin, it is improper to use evidence of "periodic improvements" to discount the severity of an impairment when it is based on a selective review of the record. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-

24 (6th Cir. 2014) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) and *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008)). Similarly, the fact that plaintiff did not discuss the symptoms of his esoteric, inner-ear condition at an unrelated cholesterol check does not demonstrate that Drs. Das and Klyop's opinions were consistent with the record as a whole. Finally, a close review of the counseling records referenced by the ALJ regarding plaintiff's gait show that it was significantly more irregular than not. At visits between 2017 and 2019 with Drs. Cox and Jones, plaintiff generally exhibited unsteady gate, imbalance, or the use of an assistive device (Tr. 954, 958, 962, 966, 974, 982, 986, 990, 994, 998, 1008, 1011, 1015, 1019, 1054, 1058, 1062) and only occasionally did not (Tr. 970, 978, 1002).

In view of the above, the Court finds that the ALJ failed to explain why the opinions of Drs. Das and Klyop are consistent with the record and, thus, more persuasive than those of plaintiff's treating and examining physicians. Moreover, the ALJ failed to explain why Drs. Das and Klyop's opinions were supportable, and the ALJ's decision does not otherwise provide such an explanation through her discussion of the medical history. *Cf. Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 WL 3056108, at *12 (W.D. Tenn. July 20, 2021) (where the ALJ identified parts of the medical record that did not support a finding of disability, the ALJ satisfied the purpose of the regulations without explicitly addressing the supportability factor). Here, the ALJ referred to the exact same string of "varying evidence" just discussed to discount the opinions of Drs. Samy, Pensak, Martin, and Ms. Rauen without an explanation for why it

supported the state agency reviewers' opinions and not theirs.  (*Compare* Tr. 28-29 *with* Tr. 29-30).

In particular, the ALJ does not explain why the opinions of Dr. Pensak, Dr. Martin, and Ms. Rauen—which are consistent with each other[11] as well as the opinions of other treating and examining physicians and third-party statements—are less consistent with the record than those offered by the state agency reviewers.  (*See* Tr. 858 (Dr. Samy) (despite following prescribed treatment, "[plaintiff] is still beset by significant dizziness."), Tr. 1022-23 (Dr. Cox) (plaintiff would struggle to concentrate, persist, maintain pace more than 50% of the time and miss five or more days of work per month), Tr. 1024 (Dr. Jones ) (Plaintiff "continues to struggle with significant depression as a result of his inability to work due to his chronic medical condition."), Tr. 880 (Dr. Lafranconi) (plaintiff's vertigo symptoms had become debilitating since their onset in 2012), Tr. 789 (Dr. Wierville ) ("These signs and symptoms suggest that [plaintiff] may demonstrate objective limitations in [maintaining attention and concentration and in maintaining persistence and pace] at a level prompting performance concerns by others."), and Tr. 850 (Dr. Jewell) ("I do not think it is likely that [plaintiff] would be successful in a work situation unless he improves in terms of his mood and anxiety symptoms.")).[12]  To the extent that certain of these opinions do not go to functional limitations, specifically, or even go to the ultimate issue of

---

[11] As previously summarized, Dr. Pensak opined that plaintiff had issues with focus, attention, and concentration that would cause significant amounts of "off-task" time and/or absences depending on symptoms.  (Tr. 878).  Ms. Rauen provided a similar opinion but quantified the "off-task" time at 20-25% of the day and absences of one to two days per week.  (Tr. 950).  Dr. Martin opined that plaintiff would miss 7-10 days per month due to his headaches. (Tr. 882).

[12] While the ALJ was under no obligation to articulate her consideration of the third-party statements in the record, 20 C.F.R. § 1520c(a)-(c), they are also consistent with the foregoing opinions.  (*See* Tr. 504-12 (third-party statements from seven family members and coworkers who have witnessed the symptoms of plaintiff's impairment and overall decline in mental and physical health)).

disability, it was still improper for the ALJ to ignore their consistency with each other. *See McGrew v. Berryhill*, No. 3:16-cv-220, 2017 WL 4324765, at *5 (S.D. Ohio Sept. 29, 2017) (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011) ("[T]he fact that the ultimate determination of disability, *per se*, is reserved to the Commissioner, 20 C.F.R. § 404.1527(e), did not supply the ALJ with a legitimate basis to disregard the physicians' [opinions].")).

The ALJ did offer three reasons, other than "varying evidence," for discounting the opinions of Drs. Pensak and Martin. First, she stated that Dr. Pensak's opinion was vague and possibly influenced by plaintiff's counsel. (Tr. 29). While Dr. Pensak did not assign particular percentages of the day or days in the week that plaintiff would be "off task" or absent, as did Ms. Rauen, he specifically incorporated Ms. Rauen's detailed notes about plaintiff's condition. (Tr. 878) ("It is also my medical opinion that the in-depth outline that has been previously submitted by [Ms. Rauen] gives an idea of the symptoms, treatment, and describes [plaintiff's] condition."). Moreover, a single reference in a medical record to plaintiff's counsel's request for a "change of wording for disability paperwork" (Tr. 904) is not tantamount, without more, to substantial evidence that Dr. Pensak's opinion was not his own.

Second, the ALJ implied that Dr. Martin's opinion using a "fill-in-the-blank" form is inherently unreliable. (Tr. 29). The Commissioner cites several cases supporting the proposition that it is permissible to assign less weight to "fill-in-the-blank," "check-box," or other such opinions where they are unsupported by explanation or objective medical evidence. (*See* Doc. 18 at PAGEID 1206). The form that Dr. Martin used here, however, incorporates the details of

26

plaintiff's symptoms and diagnosis. (*See* Tr. 881). Dr. Martin explains that plaintiff's headaches have the features of migraines and were possibly aggravated by plaintiff's 2016 surgery. (*Id.*). Further, as explained above, the "varying evidence" cited by the ALJ for the weight that she assigned to Drs. Das and Klyop does not demonstrate that Dr. Martin's opinion is inconsistent with the totality of evidence in the record. *Cf. Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (ALJ's decision to not give significant weight to a "check-box" medical opinion was based on substantial evidence where the opinion was conclusory *and* not consistent with other substantial evidence in the case record).

The ALJ also found the opinions of Drs. Zeune and Murry-Hoffman, that plaintiff had no significant limitations in any abilities related to concentration or persistence, to be "generally persuasive" because they were "mostly consistent with other evidence." (Tr. 30). In particular, the ALJ refers to counseling records showing variable mental status examination findings, variable moods, and some improvement with medication (*id.*, referring to Tr. 586-88, 627, 676, 690, 854, 940, 953-1004, 1006-21, 1053-64); somewhat conflicting consultative examination findings (Tr. 787 (with Dr. Wierwille, plaintiff tracked conversation adequately and was not distracted by ambient office sounds but became tangential and required redirection); Tr. 848 (with Dr. Jewell, plaintiff was pleasant and appropriate and performed average or above on most tests but was also irritable and agitated)); and concludes with a series of reports about plaintiff's reported abilities to complete basic daily activities from several sources, which indicate varying levels of ability. (*See* Tr. 30, referring to plaintiff's reports to Dr. Wierwille (Tr. 784-89), Dr. Jones (Tr. 1058), and Dr. Cox (953-54)). This same evidence is later cut-and-pasted into the

27

portion of her decision where the ALJ discusses the opinions of Drs. Cox and Jones. (*Compare* Tr. 30 *with* Tr. 31-32). In neither section, however, does the ALJ explain why the recited evidence is consistent with the opinions of Drs. Zeune and Murry-Hoffman but not those of Drs. Jones and Cox. (*Id.*). As best the Court can tell, the ALJ simply found the evidence, overall, to be "varying." (Tr. 30, 31). As such, as with the opinions of Drs. Das and Klyop, the Court finds that the ALJ failed to "*explain* how [she] considered the supportability and consistency factors" for the opinions of Drs. Zeune, Murry-Hoffman, Cox, and Jones in her written decision. 20 C.F.R. § 404.1520c(b)(2) (emphasis added).

As to Dr. Jones's opinion in particular, the ALJ did offer three additional reasons for finding Dr. Jones's opinion was inconsistent with the record: (1) Dr. Jones opined on plaintiff's ability to work (an issue reserved to the Commissioner), (2) plaintiff did not want to take medication for his anxiety and depression, and (3) plaintiff stopped driving only because of transmission issues. (Tr. 31). None of these reasons is substantially supported by the record.

As to the first reason, Dr. Jones mentions plaintiff's ability to work in connection with why he is depressed, but she does not actually offer an opinion that plaintiff cannot work. (Tr. 1024). As to the second reason, the ALJ cites plaintiff's report to Dr. Wierwille in September 2017 that he did not wish to take medication to manage his depression and anxiety (Tr. 787). What the ALJ fails to note, however, is that a mere five months later, plaintiff in fact began taking medication for his anxiety and depression. Starting in February 2018, plaintiff began taking Buspirone (Buspar) and Desvenlafaxine (Pristiq), which were initially prescribed by Dr. Lafranconi to treat his anxiety and depression. (Tr. 533). Plaintiff continued taking these

28

medications throughout the relevant time period (Tr. 533-34), and Dr. Jones, who took over plaintiff's medication management, additionally prescribed Abilify, Seroquel, and Trazodone to treat plaintiff's increasing symptoms. (Tr. 1055, 1059, 1062). Finally, plaintiff did not testify that he stopped driving because of transmission issues (*compare* Tr. 84 *with* Tr. 100); the record has numerous references to plaintiff's inability to safely drive. (*See, e.g.*, Tr. 864 (driving off the road); Tr. 995 (plaintiff reports difficulty driving safely)). The reasons proffered by the ALJ do not substantially support her conclusion that Dr. Jones's opinion was inconsistent with the record.

For the reasons above, the ALJ's evaluation of the medical opinion evidence is not supported by substantial evidence. The ALJ failed to explain why the opinions of the state agency reviewers were more consistent with the record than those of plaintiff's treating and examining medical sources. Moreover, the ALJ's failure to discuss the supportability of the opinions of the state agency reviewers is not otherwise satisfied through her discussion of plaintiff's medical records. Neither the "varying evidence" recited nor the other specific reasons discussed above constitute substantial evidence to support the ALJ's conclusions about the lack of persuasiveness of the opinions of Dr. Samy, Dr. Martin, Dr. Pensak, Ms. Rauen, Dr. Cox, and Dr. Jones. This assignment of error is sustained.

2. Listings

At Step Three, plaintiff carries the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, App. 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20

C.F.R. § 404.1520(a)(4)(iii).  If a claimant meets all of the criteria of a listed impairment, he is

disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e); *Bowen*

*v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653 ("A claimant must

satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must

"actually evaluate the evidence, compare it to [the relevant listed impairment], and give an

explained conclusion, in order to facilitate meaningful judicial review."  *Reynolds v. Comm'r of*

*Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).  Otherwise, "it is impossible to say that the

ALJ's decision at Step Three was supported by substantial evidence."  *Id.* (citations omitted).

The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the

claimant does not raise the listing before the ALJ."  *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x

639, 641 (6th Cir. 2013).  "If, however, the record 'raise[s] a substantial question as to whether

[the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing."  *Id.*

at 641 (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Reynolds*, 424 F.

App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the

claimant's physical impairments, when the ALJ found that the claimant had the severe

impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his

finding to raise a 'substantial question' as to whether he satisfied a listing."  *Smith-Johnson v.*

*Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at

641-42).  "Rather, the claimant must point to specific evidence that demonstrates he reasonably

30

could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a Listing's criteria).

a. *Listing 2.07*

Listing 2.07 is defined as: "***Disturbance of labyrinthine-vestibular function (***Including Ménière's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing.  With both A and B: **A.** Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and **B.** Hearing loss established by audiometry."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.07.

Plaintiff argues that the ALJ failed to find that his SSCD meets or equals Listing 2.07. Plaintiff contends that the ALJ summarily rejected its applicability, ignoring plaintiff's well-established history of vestibular dysfunction.  Plaintiff points to a summary of SSCD testing compiled and Listings Questionnaire completed by Ms. Rauen as evidentiary support for his position.  (*See* Tr. 859-63, 1005).  The Commissioner responds that plaintiff did not demonstrate the initial component of the Listing's definition, which requires (1) frequent attacks of balance disturbance, (2) tinnitus, *and* (3) progressive loss of hearing.  The Commissioner further argues that plaintiff has not identified the underlying tests demonstrating vestibular labyrinth dysfunction or hearing loss.  Finally, the Commissioner notes that the state agency physicians specifically determined that Listing 2.07 was inapplicable.

31

The ALJ's decision includes the following discussion of Listing 2.07:

Listing 2.07, for disturbance of labyrinthine-vestibular function characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. The listing also requires A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests, and B. Hearing loss established by audiometry. There is inadequate evidence that these requirements are satisfied.

Other listings in section 2.00, for vision and hearing loss, were also reviewed but the requirements are not satisfied.

(Tr. 18). Drs. Das and Klyop acknowledged plaintiff's vertiginous disorder but also pointed to an audiogram showing hearing within normal limits and excellent word reception. (Tr. 122, 138-39).

The Listings Questionnaire completed by Ms. Rauen in July 2019 includes the entirety of Listing 2.07. (Tr. 1005). Ms. Rauen checked that she believed that plaintiff meets or equals the listing and added the following: "multiple audiograms . . . 4/2016 – 2/2019 . . . demonstrate left sided hearing loss. . . . [Vestibular-Evoked Myogenic Potential (VEMP)[13]] absent by 70 [decibels] left, present [VEMP] at 75 or below bilaterally, both tests in 2016[.]" (*Id.*). Ms. Rauen also added "[plaintiff] has residual disequilibrium, uncompensated, from SSCD and likely vestibular migraine/migraine equivalent." (*Id.*).

Plaintiff has failed to point to specific evidence showing he meets or equals every requirement of Listing 2.07. The audiograms that reflect hearing loss are not appended to the Listings Questionnaire, nor has plaintiff directed the Court's attention to this evidence in the

---

[13] VEMP is a commonly used clinical assessment for patients with complaints of dizziness. "Safe use of acoustic vestibular-evoked myogenic potential stimuli: Protocol and patient-specific considerations," available at https://mayoclinic.pure.elsevier.com/en/publications/safe-use-of-acoustic-vestibular-evoked-myogenic-potential-stimuli (last accessed February 9, 2022).

record, including the February 2019 audiogram referenced by Ms. Rauen. The April 2016 audiogram that Ms. Rauen references was actually within normal limits. (Tr. 861). Moreover, Ms. Rauen's compilation of plaintiff's otolaryngologic treatment that appears elsewhere in the record does not otherwise reflect the *progressive* hearing loss required by Listing 2.07. (Tr. 859-63). Plaintiff must demonstrate he meets each element of the Listing, including progressive hearing loss. *See Zebley*, 493 U.S. at 530. In addition, the record reflects an audiologic evaluation in November 2016 that showed excellent word recognition in both ears, normal right-eared hearing, and "mild" findings as to the left ear. (Tr. 702). For the foregoing reasons, the ALJ's decision to credit the evidence from Drs. Das and Klyop over that from Ms. Rauen is substantially supported by the record. Even assuming plaintiff satisfies part A of the Listing (vestibular tests reflecting disturbance), this does not overcome the shortcomings related to part B (progressive hearing loss *demonstrated by audiometry*). *See Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

Although the ALJ did not provide specific reasons for why she found that plaintiff did not meet or equal this Listing, any error is harmless. "Any failure of the ALJ in evaluating an impairment under a Listing is harmless if the Plaintiff did not show he met or equaled the Listing." *Leary v. Comm'r of Soc. Sec.*, No. 2:20-cv-1135, 2020 WL 5290538, at *7 (S.D. Ohio Sept. 4, 2020), *report and recommendation adopted*, 2020 WL 5760470 (S.D. Ohio Sept. 28, 2020) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359 (6th Cir. 2014) and *Ison v.*

*Acting Comm'r of Soc. Sec.*, No. 2:16-cv-464, 2017 WL 4124586, at *6 (S.D. Ohio Sept. 18, 2017)).  This assignment of error, as it pertains to Listing 2.07, is overruled.

### b.  Listings 12.04 and 12.06

Plaintiff also argues that the ALJ erred by finding that his depression and anxiety did not meet or equal Listings 12.04 and 12.06.  In particular, plaintiff argues that the ALJ incorrectly determined that plaintiff had only a "moderate" and not "marked" or "extreme" limitation in interacting with others and concentrating, persisting, or maintaining pace.  The Commissioner does not expressly counter these Listing arguments but elsewhere argues that the ALJ's opinion regarding plaintiff's mental functional areas was supported by substantial evidence.  (*See* Doc. 18 at PAGEID 1203-04).

Listing § 12.04 establishes the criteria for depressive, bipolar, and related disorders; Listing § 12.06 establishes the criteria for anxiety and obsessive-compulsive disorders.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.04, 12.06.  To meet the Listings' severity level for these categories of disorders, a claimant must show that he meets: (1) the impairment-specific medical criteria in paragraph A and (2) the functional limitations criteria in paragraph B or C.[14]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).  In evaluating mental impairments, the ALJ must rate the degree of functional limitation associated with a plaintiff's medically determinable mental impairments.  20 C.F.R. § 404.1520a(c).  The ALJ is to rate limitations in four broad

---

[14] The ALJ also found that plaintiff did not meet the paragraph C criteria (*see* Tr. 20), but plaintiff does not challenge this finding.  Therefore, plaintiff has waived any challenges regarding the paragraph C criteria.  *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.") (citation omitted).

functional areas.  *Id.* at § 404.1520a(c)(3).  Effective January 17, 2017, the paragraph B criteria

for Listings 12.04 and 12.06 include the following four functional areas:

> 1. Understand, remember, or apply information.

> 2. Interact with others.

> 3. Concentrate, persist, or maintain pace.

> 4. Adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(E)(1)-(E)(4), 12.04(B), 12.06(B).

In rating limitations, ALJs are to use the following five-point scale: none, mild, moderate,

marked, and extreme, with the latter being "incompatible with the ability to do any gainful

activity."  20 C.F.R. § 404.1520a(c)(4).  *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F.

To satisfy Listing 12.04 or 12.06, the ALJ must find "[e]xtreme limitation of one[] or marked

limitation of two" of these broad functional areas.  *Id.* at §§ 12.04(B), 12.06(B).  The regulations

describe the points along this scale, as relevant here, as follows:

> c. *Moderate limitation*.  Your functioning in this area independently,
> appropriately, effectively, and on a sustained basis is fair.

> d. *Marked limitation*.  Your functioning in this area independently, appropriately,
> effectively, and on a sustained basis is seriously limited.

> e. *Extreme limitation*.  You are not able to function in this area independently,
> appropriately, effectively, and on a sustained basis.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2).

The ALJ identified plaintiff as having severe major depressive disorder and anxiety

without agoraphobia for purposes of paragraph A of these Listings.  (Tr. 17).  As to the

paragraph B criteria, the ALJ found that plaintiff had no more than a moderate limitation in any

area. (Tr. 18-20). As relevant to plaintiff's appeal, the ALJ first found:

> In interacting with others, [plaintiff] has a moderate limitation. [Plaintiff] made a remarkable social presentation at his consultative exam, as he was generally pleasant and appropriate throughout the interview but notably irritable and agitated. In previous positions of employment, he reportedly had some difficulty getting along well with others, including supervisors and coworkers, particularly when he felt as though someone had been inappropriately "wronged" (6F). Later, he was pleasant, calm, cooperative, and easy to engage (27F/6). As for getting along with others, [plaintiff] testified that he has problems with his wife due to what she calls his "male pride". (testimony). He stated that when others discuss his health it causes friction. Since his alleged onset date, he spends time with his wife, her family and their daughter. He goes out to eat once a month and attends church but not regularly (testimony). Balancing these subjective and objective reports demonstrates the claimant has a moderate limitation in this area.

(Tr. 19)

Plaintiff argues that his behavior during a short consultative examination and occasional

instances of going to church and eating out cannot be extrapolated to show that he can sustain

interactions with others in a full-time work environment. The fact, however, that isolated

interactions and activities may not demonstrate an ability to do full-time work on a sustained

basis does not mean that an ALJ errs in considering them. *See Warner v. Comm'r of Soc. Sec.*,

375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered

Warner's ability to conduct daily life activities in the face of his claim of disabling pain.");

*Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) (citing 20 C.F.R. §

404.1572 and quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997))

("Although the ability to [perform activities of daily living] is not direct evidence of an ability to

do gainful work, '[a]n ALJ may . . . consider [such] activities . . . in evaluating a claimant's assertions of pain or ailments.'").

Plaintiff also argues that the ALJ ignored parts of his testimony that showed that he did not frequently venture out of the house due to complications from his physical impairments (motion sickness). Plaintiff also argues that the ALJ did not properly consider his testimony about his difficulty interacting with others or the several third-party statements that discussed this issue (*see* Tr. 504-12). The ALJ's decision, however, explicitly references consideration of this testimony. (*See* Tr. 21-22) (summarizing plaintiff's testimony regarding his difficulties with interpersonal interaction and his activities of daily living). The ALJ also expressly noted her consideration of the lay witness statements containing similar observations. (Tr. 21). The Court therefore finds that the ALJ relied on substantial evidence in support of her finding that plaintiff was only moderately impaired in his ability to interact with others.

With respect to the concentrating, persisting, or maintaining pace, the ALJ found that:

[Plaintiff] has a moderate limitation. Across the consultative exam, he tracked the flow of conversation adequately, but become tangential at times, requiring redirection from the examiner. He did not show distraction by ambient office sounds (6F). At a neuropsychological evaluation, auditory attention and working memory (the ability to mentally manipulate information) was average. Speed of information processing was average on a graphomotor task. Performance on a speeded task of visual attention was superior. With the addition of a mental flexibility and divided attention component, speed of performance remained superior. On a task of concept formation and set shifting performance was average. Performance was superior on a verbal task of abstract reasoning (7F/58). Other times, his attention/concentration was adequate (20F/6, 21F, 27F/6). In 2018, examinations repeatedly found [plaintiff] alert and oriented to person, time, place and situation, in no acute distress and with clear, logical and goal-directed thoughts (18F/2, 6, 10, 18, 26, 42) . Similarly, in 2019 and 2020, he was found alert and oriented to person, time, place and situation with adequate attention\concentration and grossly intact recent and remote memory (21F/2;

27F/2, 6).  He stated he returned to social media and Facebook (testimony).
Therefore, he has a moderate limitation in this area.

(Tr. 19).

As to this functional area, plaintiff's primary argument is that the ALJ did not

meaningfully consider the opinions of several treating medical providers that were directly on

point.  Plaintiff also argues that the ALJ relied only upon the portions of Dr. Jewell and Dr.

Wierwille's consultative examinations that supported her conclusion that plaintiff was only

moderately limited in this area to the exclusion of their other findings.

To the extent that this part of the ALJ's decision implicitly depends on the ALJ's

evaluation of the persuasiveness of the medical source opinions concerning this mental

functioning area—in particular, the opinions of Drs. Pensak, Martin, Cox, and Ms. Rauen—it is

not based on substantial evidence for the reasons discussed above.  *See supra* part III(E)(1).  To

the extent that the ALJ references Dr. Wierwille's consultative examination and Dr. Jewell's

neuropsychological examination in this part of her decision, the varying aspects of the reports

referenced (some supporting more limitation and some less) do little to explain the ALJ's

conclusion.

The ALJ also refers to several records from Drs. Cox and Jones reflecting that plaintiff

had adequate attention/concentration; was oriented to person, time, place, and situation; was not

in acute distress; and had no memory issues.  (Tr. 19).  The ALJ's reference, however, to routine

mental status markers on the dates/times of plaintiff's visits ignores the interplay between

plaintiff's physical impairment and this mental functioning area, which is particularly relevant in

this case.  (*See* Tr. 847 (plaintiff's report to Dr. Jewell that his anxiety increased with episodes of

dizziness or imbalance); Tr. 952 ("[Plaintiff's] medical problems are exacerbated by anxiety and panic attacks and severe depression. The inverse is especially true. . . ."); Tr. 1023 (Dr. Cox note: "When vestibular dysfunction impairs balance, concentration and gait he cannot perform . . . work or be social[,]" which exacerbates mental impairments); Tr. 1024 (Dr. Jones note stating that vestibular dysfunction impacts plaintiff's ability to work, drive, or socialize normally, which exacerbates mental impairments)). The ALJ finally refers to plaintiff's testimony that he had returned to social media, but the ALJ does not explain how this information cuts in favor of a finding of a "moderate," as opposed to "marked" or "extreme," limitation in concentration, persistence, or pace.

Neither the opinion nor the non-opinion evidence referenced by the ALJ regarding plaintiff's ability to concentrate, persist, or maintain pace substantially supports the ALJ's finding of a moderate limitation. The ALJ's finding regarding this paragraph B criterion is therefore not based on substantial evidence. As pertaining to Listings 12.04 and 12.06, this assignment of error is sustained.

### 3. Residual functional capacity

Plaintiff argues that the ALJ's RFC determination that he could maintain focus, attention, and concentration during a workday or sustain work without excessive absences is not supported by substantial evidence. Plaintiff argues that Drs. Das and Klyop's failure to recommend exertional limitations reflects a patent misunderstanding of SSCD and the underlying medical evidence supporting plaintiff's diagnosis. Plaintiff also points to various record evidence as

overwhelmingly supportive of more significant (1) restrictions/limitations in plaintiff's ability to remain on-task and (2) plaintiff's absenteeism.

The Commissioner responds that plaintiff invites the Court, improperly, to reevaluate the medical opinions. The Commissioner also argues that the opinions of the treating and examining physicians are not as homogenous as plaintiff suggests, and the ALJ's RFC determination is not required to mirror any particular medical opinion. The Commissioner also argues that the ALJ accounted for medical evidence post-dating the state agency review because she added more restrictions to her RFC than the state agency reviewers suggested was necessary. Finally, the Commissioner argues that opinions regarding "off-task" percentages and absenteeism are speculative.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). A claimant's RFC assessment must be based on all the relevant evidence in his case file. (*Id*.) The governing regulations[15] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)-(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from the claimant's medical sources." 20 C.F.R. § 404.1520c(a).

---

[15] Plaintiff's application was filed after March 27, 2017. Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c.

For the reasons discussed in part II(E)(1) above, the Court finds that the ALJ erred in her review of the medical source opinions in the record. This includes the opinions of Drs. Das and Klyop that plaintiff suffered no exertional limitations. The ALJ did not discuss the supportability of these opinions, which is not otherwise clear from the medical record referenced in the ALJ's decision. Dr. Klyop's opinion, for example, relies on a record from Ms. Rauen reflecting adequate hearing, vision, and motor functioning; and normal mood, ocular motility, skin, breathing, and nerve functioning. (Tr. 139, referring to Tr. 853-55). None of these observations, however, concern the vertigo or associated balance problems that form the basis of plaintiff's claim. In fact, Dr. Klyop leaves out the most relevant aspect of this record, in which plaintiff reports that "[d]izziness . . . remain[s]." (Tr. 853).

Drs. Zeune and Murry-Hoffman opined that plaintiff's ability to concentrate, persist, or maintain pace were no more than mildly affected. (Tr. 118, 135). The ALJ found their opinions persuasive because they were mostly consistent with other evidence. As discussed above, however, the ALJ does not explain *how* the evidence cited in support of this conclusion is consistent with their opinions. These state agency psychologists concluded that Dr. Wierwille's opinion was an "overestimate" of the severity of plaintiff's mental limitations/restrictions, but they provide no support for this conclusion. (Tr. 125, 142).

The Commissioner points to additional restrictions imposed by the ALJ in her RFC that demonstrate the ALJ's consideration of the totality of the evidence: that plaintiff be restricted to a reduced range of light exertional work; standing, walking, and sitting limitations; and limited to moderate noise levels. This is insufficient, however, to overcome the significant and consistent

41

record evidence (treating medical sources, consultative examiners, third-party statements) demonstrating far greater restrictions/limitations in plaintiff's ability to concentrate, persist, or maintain pace. Plaintiff emphasizes that the VE testified that being "off task" more than 10% of the time would render plaintiff unemployable (*see* Tr. 70), with Ms. Rauen and Dr. Cox endorsing specific "off-task" percentages significantly higher than that (*see* Tr. 950, 951-52, 1022-23). In addition, plaintiff highlights Dr. Wierwille's statement that plaintiff's reported concentration and focus issues were consistent with his behavioral presentation during his consultative examination. (Tr. 789). Plaintiff also highlights that the VE testified that missing two days of work per month would be work preclusive (Tr. 69), with Drs. Pensak, Martin, Cox, and Ms. Rauen opining that that plaintiff would miss at least that much work—if not significantly more. (Tr. 878, 882, 950, 952, 1023). While the Commissioner argues that there is less consistency among these opinions than alleged by plaintiff, he fails to point to any major divergence.

Finally, the Commissioner cites two cases in which courts disregarded estimates of absences as vague or speculative. In *Wagers v. Comm'r of Soc. Sec.*, the court found no way to tell from the form opinion submitted whether the physician completing it had reached the conclusion on absences because of plaintiff's pain, doctors' appointments, medication side effects, or some other reason. No. 1:15-cv-312, 2016 WL 4211811, at *7 (S.D. Ohio June 28, 2016), *report and recommendation adopted*, 2016 WL 4194504 (S.D. Ohio Aug. 9, 2016). In *McGrew v. Berryhill*, the physician's opinion that contained an absence estimate was also inconsistent with the rest of the record and his own treatment notes. 2017 WL 4324765, at *8.

42

This record is distinguishable.  Dr. Pensak and Ms. Rauen's opinions incorporate an outline of plaintiff's treatment for SSCD (Tr. 859-63) to support why each believes that plaintiff would be "off task" so frequently.  Dr. Cox explains that her opinion takes into account the mutually escalating interplay between plaintiff's physical and mental impairments.  (Tr. 952, 1023).  Dr. Martin's opinion makes clear that plaintiff suffers migraine headaches that were not caused, but likely exacerbated, by his ear surgery, resulting in his opinion that plaintiff would miss 7-10 days of work per month.  (Tr. 881-82).

In sum, the ALJ's decision to disregard the treating and examining medical source opinions in formulating plaintiff's RFC is not based on substantial evidence.  Plaintiff's third assignment of error is sustained.

### III.  Conclusion

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  This matter will be remanded further proceedings, including (1) reevaluation of the medical opinion evidence of record; (2) reconsideration of Listing 12.04, Listing 12.06, and plaintiff's RFC in conjunction with such reevaluation; and (3) the taking of additional medical and vocational evidence as warranted.

Based on the foregoing, plaintiff's Statement of Errors (Doc. 13) is **SUSTAINED IN PART AND OVERRULED IN PART** and the Commissioner's non-disability finding is

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS** consistent with this

Order.

Date:    2/23/2022

_____
Karen L. Litkovitz
United States Magistrate Judge